FILED
MAR 26 2012
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                          ] Case No. 10-51522-ASW
                                               ]
ZENAIDA MASACAYAN POSTOLICA and                ] Chapter 11
DANUT LAUR POSTOLICA,                          ]
                                               ]
                    Debtors.                   ]
_____]

**MEMORANDUM DECISION ON EVIDENTIARY HEARING REGARDING DEBTORS'
MOTION TO SET VALUE OF REAL PROPERTY**

Before the Court is the motion ("Motion") of debtors Zenaida and Danut Postolica (collectively "Debtors") to set the value of property located at 2827-2833 B Street, Rosamond, California 92560 ("Property"). For purposes of their Chapter 11 plan of reorganization, Debtors seek to value the Property at $70,000, limit East West Bank's secured claim to $70,000 and adjust the interest rate on the claim from the current seven percent to five percent. East West Bank opposes Debtors' motion, and instead seeks a determination that the Property is worth $100,000.

The Court held a two-day evidentiary hearing on the Motion. Following the conclusion of that hearing, the matter was taken under submission. At the evidentiary hearing, Debtors were represented by Lewis Phon, Esq. of The Law Offices of Lewis Phon.

Celine Mui Simon, Esq. of French & Lyon, Attorneys at Law appeared on behalf of East West Bank. On the first day of the hearing, Debtors called Jesus Medina ("Medina"), a real estate broker, and Zenaida Postolica ("Postolica") as witnesses. East West Bank called Kenneth G. Ricks ("Ricks"), an appraiser, as a witness. On the second day, East West Bank called Ricks as a witness and Debtors recalled Medina and Postolica as witnesses.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

Debtors commenced this case by filing a petition under Chapter 11 of the Bankruptcy Code on February 18, 2010. Debtors own several investment properties, including the Property. The Property is a four-unit residential building. The Property is encumbered by a first deed of trust securing a loan from East West Bank. On the bankruptcy petition date, Debtors owed East West Bank $95,157.03 under the note.

On August 28, 2010, Debtors filed the Motion. On January 20, 2011, East West Bank filed an objection to the Motion.

At the evidentiary hearing, both Medina and Ricks were qualified by the Court to testify as experts concerning the value of the Property. Postolica, while not a qualified expert, but as an owner, was able to provide testimony that was helpful to the Court.

Medina has been a licensed real estate broker in California since 1984 and in Nevada since 2005 and owns a brokerage company, Crestline Financial and Marketing Services, Inc. Medina has over twenty (20) years of experience working as a real estate broker selling and buying homes in the San Francisco Bay Area for Medina's real estate clients. As part of Medina's services, Medina values real properties before listing the properties for sale and advises clients of the properties' values. Debtors asked Medina to determine the market value of the Property as a personal favor to Debtors. According to Medina's testimony, Medina knows Zenaida Postolica's sister.

In Medina's Declaration filed on June 1, 2011, Medina states that Medina believes the fair market value of the Property was $80,000. Medina explains that the $80,000 value reflects the price at which the Property would likely sell in ninety (90) days. At trial, Medina opined that he believed the Property to be worth between $60,000 and $80,000. Medina explained that his valuation was based on what he thought a reasonable investor would likely pay for the Property.

In arriving at Medina's valuation for the Property, Medina testified that he considered several factors, including: (i) the Property's relatively high vacancy rate of 25%; (ii) the general condition of the Property, including Medina's estimate that the Property needs $10,000 to $12,000 for landscaping and $2,000 to $3,000 for a new fence; and (iii) Medina's opinion that the real estate market in Rosamond has been declining for the past two years. Medina also testified that his valuation was based on one single comparable property, as well as Ricks' comparable properties

(which includes Medina's comparable property as Ricks' comparable number one).

Ricks is a certified general real estate appraiser throughout the State of California, a real estate broker, and principal of Kenneth Ricks & Associates. Ricks has been active in appraising real estate in southern California since 1986 and estimates that he prepares roughly twenty-five (25) real estate appraisals for potential buyers every year. Ricks was retained by East West Bank to conduct an appraisal of the Property. Ricks appraised the Property twice. On September 22, 2010, Ricks appraised the Property at $90,000. On June 29, 2011, Ricks appraised the Property at $100,000. Ricks testified that the reason for the discrepancy between the two appraisal values was because he had no access to the interior of the Property during the first appraisal. In addition, Ricks testified that there was only one other comparable sale at the time of the first appraisal. Ricks testified that he had access to the Property during the second appraisal and was able to make a better evaluation of the interior of the Property. Further, Ricks testified that there were more comparables where the sales had closed by the time of the second appraisal.

In appraising the Property, Ricks testified that he used three methods to value the Property: (i) the income approach; (ii) the sales comparison approach; and (iii) the replacement cost approach. Ricks stated that he gave emphasis to the sales comparison and income based valuation approaches because these methods best reflect the actions of the buyers and sellers.

The sales comparison approach to value is based upon an analysis of comparable properties within the same neighborhood in light of factors such as the real estate market of the particular neighborhood, the school systems, and the dwelling's characteristics including square footage, age, and condition. Adjustments are then made to the sales price of the comparable properties for characteristics of each comparable property which would make the comparable property more or less valuable than the Property, including variations in total square footage and living space, the total number of bedrooms/bathrooms/fireplaces, superior or inferior condition of the roof, style of heating and air conditioning, additions to the property such as a pool, and whether the property or portions of the property such as the kitchen had been recently remodeled.

According to Ricks' testimony and appraisal, Ricks used five comparable properties for Ricks' sales comparison approach. The comparable properties ranged from 0.2 to 0.4 miles from the Property. Four of the properties closed escrow between October 2010 and February 2011. One of the properties did not close escrow prior to Ricks' valuation, and whether that property ever closed escrow is still unknown. The adjusted sales prices of the comparable properties ranged from $47,525 to $113,590.

In valuing a property based on the income approach, the adjusted sales price of each comparable property is divided by that property's monthly rents. The resulting figure is the gross rent multiplier for that property. Using the income approach to valuation, the subject property can then be valued by multiplying the monthly rents for the subject property by a representative

gross rent multiplier for the comparable properties. The theory behind this approach is that an investor is likely to pay a certain purchase price for a certain income stream.

The gross rent multiplier figures for Ricks' comparable properties ranged from thirty-two (32) to sixty-five (65). Ricks testified that Ricks decided to use a multiplier of forty (40) for Ricks' income approach valuation, which Ricks acknowledged is on the low end of the gross rent multiplier range for Ricks' comparables. According to Ricks' appraisal, when the Property has no vacancies, the total monthly rents collected is $2,740. Ricks' appraisal also includes a separate calculation to reflect the seven month vacancy of one unit on the Property, which has reduced the actual total monthly rent to $2,140. However, Ricks testified that a 25% vacancy rate is uncommon for Rosamond and that the more appropriate vacancy rate is 10%. Ricks stated that the on-site manager told him that it usually takes thirty (30) days to rent out a unit in the area after the unit is fixed up and the previous non-paying tenant is evicted. Ricks stated that Debtors are charging high rent prices for some of the Property's non-vacant units. To value the Property, Ricks first calculated what Ricks believes is the market rental value for each of the Property's four units and added those figures. The resulting value, which assumes no vacancies, is $2,500. When Ricks multiplied his gross rent multiplier (40) by his value for the total monthly rental income ($2,500), the resulting value was $100,000. Thus, Ricks' valuation of the Property under the income approach is $100,000. Ricks also testified that because of the climate in the area where the Property is located, it would not make sense for an owner to invest

$10,000-$12,000 in landscaping improvements (as Medina had suggested).

Postolica also opined as to the value of the Property and provided other important and useful information regarding the Property. Postolica explained that after Edwards Air Force Base closed, the Property attracted primarily low-income tenants. Postolica explained that these tenants tended to leave without notice, sometimes stayed for only two to three months, vandalized the Property, and frequently stole appliances including the refrigerator and stove as they vacated the Property.

In clarifying the sum of these costs, Postolica explained that the replacement cost for a stove is roughly $500; the replacement cost for a refrigerator is roughly $700-$1000; the replacement cost for swamp coolers is $350; the replacement cost for a clothes washer is roughly $350; and the replacement cost for a dryer is $350. Postolica estimated that every time there is a vacancy, it costs roughly $1,000 to evict the tenant and $2,500 to replace the stolen items and repair damage to the unit. Postolica testified that as of the October hearing, one of the four units of the Property had been vacant for seven months. As a result of these costs, as well as Postolica's experience as an investor in rental properties, Postolica estimated that the fair market value for the Property is less than $70,000.

II.

ANALYSIS

Debtors' Motion requests that this Court determine the value and status of East West Bank's lien as partially unsecured and void. Debtors contend that because the value of the Property on

the bankruptcy petition date was less than the debt secured by East West Bank's first priority trust deed, East West Bank's lien was partially unsecured at the time of the bankruptcy. East West Bank opposes the Motion arguing that the value of the Property exceeded East West Bank's first priority lien -- thus East West Bank's first priority trust deed is fully secured.

Debtors seek to value East West Bank's lien on the Property based on Bankruptcy Code section 506(a)(1), which states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). Debtors contend the Property value is $70,000. East West Bank contends the Property value is $100,000. If Debtors' value figure is adopted, then East West Bank's lien would be $70,000 secured and $25,157.03 unsecured. If East West Bank's value figure is adopted, then East West Bank's lien would be fully secured for $95,157.03.

Bankruptcy Code section 506(a)(1) instructs that when a court determines the value of collateral, "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property..." 11 U.S.C. § 506(a)(1). When the debtors intend to stay in their house, the proper valuation of the house under Bankruptcy Code section 506(a) is the fair market value. <u>Taffi v. United States of America (In re Taffi)</u>, 96 F.3d, 1190, 1192 (9th Cir. 1996). The fair market value is not the "replacement" value because the house is not being replaced. Neither is it the "foreclosure" value because no foreclosure is intended in

the Chapter 13 plan. <u>Taffi</u>, 96 F.3d at 1192. Similarly, no foreclosure is intended by Debtors in this Chapter 11 case. The fair market value is "the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." <u>Taffi</u>, 96 F.3d at 1192. Debtors intend to rent out units from the Property and treat East West Bank's lien as partially unsecured.

Debtors bear the initial burden of proof of overcoming any presumption established by the stated value in the secured creditor's proof of claim. <u>In re Southmark Storage Associates Ltd. Partnership</u>, 130 B.R. 9, 10 (Bankr. D. Conn. 1991). The secured creditor has the ultimate burden of persuasion to demonstrate, by a preponderance of the evidence, the value of the collateral which secures its claim. <u>Id.</u> at 10.

The Court has considered all the evidence admitted at trial as well as the parties' written briefs and oral arguments.

As previously mentioned, Debtors' expert, Medina's valuation was based on analysis of several factors which included: (i) the Property's high vacancy rate of 25%; (ii) the general condition of the Property; (iii) Medina's opinion that the real estate market in Rosamond has been declining; and (iv) one comparable property that is located .4 miles from the Property. The comparable property closed escrow on February 25, 2011 and was among the comparables that East West Bank's expert Ricks also considered. Based on these factors Medina concluded that the Property had a value between $60,000 to $80,000 as of the filing of Debtors' bankruptcy case. Debtors have

MEMORANDUM DECISION ON MOTION TO SET VALUE
OF REAL PROPERTY
9

presented sufficient evidence to overcome the presumption of value set forth in East West Bank's claim.

After weighing the evidence and testimony before the Court, the Court has ultimately determined the value of the Property by using both the income and the sales comparison approaches. The Court finds that Medina is sincere and very experienced in real estate, but that he has relatively little experience valuing properties in the region where the Property is located. That would not render his opinion of the Property's value without use to the Court because he could have used traditional methods to value the Property and consulted knowledgeable local real estate professionals to the extent necessary. However, the Court has decided not to rely substantially upon Medina's valuation because Medina's method has limited mathematical support in determining the value of the Property. Further, Medina only uses one comparable property in his valuation and the Court cannot accurately determine the value of the Property based on one comparison.

The Court is not relying on the replacement cost approach because the Court deems it less useful under the circumstances, as Ricks testified. Moreover, Debtors intend to keep the Property as an investment property and not to replace the Property with another property.

The sales comparison approach and the income approach will be addressed separately.

A. Sales Comparison Approach

First, the Court analyzes the value of the Property under the sales comparison approach. As previously mentioned, the sales

comparison approach is based upon an analysis of comparable properties within the same neighborhood in light of factors such as the real estate market of the particular neighborhood, the school systems, and the dwelling's characteristics including square footage, age, and condition. Adjustments are then made to the sales price of the comparable properties for characteristics of each comparable property which would make the comparable property more or less valuable than the Property, including variations in total square footage and living space, the total number of bedrooms/bathrooms/fireplaces, superior or inferior condition of the roof, style of heating and air conditioning, additions to the property such as a pool, and whether the property or portions of the property such as the kitchen had been recently remodeled.

Here, four of Ricks' comparable properties were similar in some respects to the Property based on the criteria stated above and had closed escrow by the time of the filing of Debtors' bankruptcy petition. The Court did not rely on the value of Ricks' fifth comparable property because the Court has no way of knowing whether that comparable actually sold and, if so, for what price. The four comparables that closed escrow by Debtors' filing of bankruptcy are: (1) 2437 Diamond St., which Ricks valued the adjusted sales price at $102,285; (2) 2801 Desert St., which Ricks valued the adjusted sales price at $47,525; (3) 1900 Poplar St., which Ricks valued the adjusted sales price at $113,590; and (4) 2761-2763 Desert St., which Ricks valued the adjusted sales price at $103,115. Each of these properties is somewhat similar in size and condition to Debtors' Property. In addition to Ricks' analysis, and based on those similarities and the proximity of the comparable properties to the

Property, the Court calculated the average adjusted sales price of the four comparables. If one factors the four comparables equally, the average adjusted sales price of the four comparables is $91,629.

B. Income Approach

The second method used by Ricks and considered by the Court, the income approach, confirms the value reached under the sales comparison approach. Use of the income approach is also appropriate because Debtors intend to retain and use the Property as an investment property. As discussed above, the theory behind the income approach is that an investor is likely to pay a certain purchase price for a certain income stream. Under the income approach, the subject property is valued by multiplying the monthly rents for the subject property by a representative gross rent multiplier for comparable properties. To calculate the gross rent multiplier, the adjusted sales price of a comparable property is divided by that property's monthly rents.

Because there is evidence of four comparable properties before the Court, the Court will use a gross rent multiplier that is the average of the gross rent multipliers of the four comparables that closed escrow by the time of the filing of Debtors' bankruptcy petition, including the one comparable property on which Debtors' expert relied. The gross rent multipliers for the comparables are: (1) 2437 Diamond St., which has a gross rent multiplier of 56.67; (2) 2801 Desert St., which has a gross rent multiplier of 37.78; (3) 1900 Poplar St., which has a gross rent multiplier of 44.83; and (4) 2761-2763 Desert St., which has a gross rent multiplier of 32. The average of these multipliers is 42.82.

Here, the total monthly rent for the four units in the Property is $2,740. The actual monthly rent for the units has been $2,140 because, if one believes Postolica, the Property has had a 25% vacancy rate for seven months. East West Bank's appraiser, Ricks, testified that a 25% vacancy rate in Rosamond is high and that the vacancy rate is closer to 10% based on Ricks' experience in valuing other rental properties in the area. Ricks testified that the monthly rent for the Property should be in the amount of $2,500. However, the Court to some extent accepts Postolica's testimony and finds that one unit has been vacant for seven months. That is some evidence of what the vacancy rate is likely to be in the future, but it is not dispositive. Nevertheless, it is significant. The Court finds that a 20% vacancy rate is more appropriate for this Property. Thus, the Court will use a 20% vacancy rate in order to calculate the income approach. The Court multiplies the average of the gross rent multiplier (42.82) by the adjusted rent ($2,192), to reach the Court's determination that the value of the Property is $93,861.44 under the income approach. The resulting value under the income approach is slightly higher than the value determined by the sales comparison approach.

C. Ms. Postolica's Testimony

Ms. Postolica testified as to the condition and value of the Property. Ms. Postolica's testimony is useful in establishing actual expenses that occurred because of stolen property and vandalism when tenants vacated the Property. Ricks testified that both the sales comparison and income approaches account for the thefts and vandalism. According to Ricks, if the Property has theft and

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION ON MOTION TO SET VALUE OF REAL PROPERTY

Case: 10-51522  Doc# 316  Filed: 03/26/12  Entered: 03/27/12 15:01:34  Page 13 of 16

13

vandalism problems, other similar properties would have similar problems and each property's adjusted sales price and rent would reflect the presence of those problems. While the sales and income approach do account for some of the costs testified by Postolica, Postilca's testimony convinced the Court that the Property has a greater turnover of tenants and a higher incidence of vandalism and stolen property than the average comparable property.

To account for this difference, the Court adjusts the calculated values of both the sales comparison approach and income approach by $2,000. Under the sales comparison approach, the value of the of the property adjusts to $89,629.00. Under the income approach, the value of the property adjusts to $91,861.44. The Court averaged the adjusted values under the sales comparison and income approaches to reach an actual value for the Property of $90,745.22.

In light of the Court's valuation of the Property, East West Bank's $95,157.03 lien against the Property is undersecured. As a result, East West Bank's lien is secured in the amount of $90,745.22. and unsecured in the remaining amount of $4,411.81.

III.

CONCLUSION

Based on the evidence admitted at hearing and the written and oral arguments of counsel, the Court finds the sales comparison and income approaches to be the appropriate methods to value this Property. While Medina was experienced and sincere, Medina's appraisal was not as reliable or accurate as Ricks' appraisal was, for the reasons explained above. The Court values the Property at $90,745.22, which is $4,411.81 less than East West Bank's first priority deed of trust in the amount of $95,157.03.

For the foregoing reasons, Debtors' Motion to determine the value and status of East West Bank's lien as unsecured is granted. The Court finds that the value of the Property was less than the amount secured by the first deed of trust at the time bankruptcy was filed. Accordingly, East West Bank's secured claim is in the amount of $90,745.22 and is unsecured in the amount of $4,411.81. Counsel for Debtors shall prepare a proposed form of order, serve it on counsel for East West Bank, and then submit it to the Court.

Dated: 3/26/12

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

Court Service List

Zenaida Masacayan Postolica
620 Morse Avenue
Sunnyvale, Ca 94085

Danut Laur Postolica
620 Morse Avenue
Sunnyvale, Ca 94085

East West Bank
Attn: Managing Agent or Corporate Officer
P.O. Box 7670
San Francisco, CA 94012

East West Bank
Attn: Managing Agent or Corporate Officer
711 Van Ness Avenue
San Francisco, CA 94102

Lewis Phon
Law Offices of Lewis Phon
4040 Heaton Court
Antioch, CA 94509

Patricia H. Lyon
French & Lyon
22 Battery Street, Suite 404
San Francisco, CA 94111

Celine Mui Simon
French & Lyon
22 Battery Street, Suite 202
San Francisco, CA 94111

Office of the U.S. Trustee / SJ
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004